Alwyn V.H. FAREY–JONES, Plaintiff,

v.

Richard G. BUCKINGHAM, Douglas H. Wolf, Frederick Forster, ICA Services and Signal Capital Holding Corporation, Defendants.

No. CV 99–4205 ADS.

United States District Court,
E.D. New York.

March 4, 2001.

Meyer, Meyer, Metli & Keneally, Esqs. LLP, Smithtown, NY (James E. Robinson, Richard Metli, of Counsel), for plaintiff.

Cooper, Brown & Behrle, P.C., New York City (Sandra Gale Behrle, of Counsel), for defendants.

### AMENDED MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This lawsuit arises out of business disputes. Over the years, Alwyn V.H. Fairy–Jones ("Jones" or the plaintiff), Richard G. Buckingham ("Buckingham" or a defendant), Douglas H. Wolf ("Wolf" or a defendant), and Frederick Forster ("Forster" or a defendant) (collectively, the "individual defendants") have had a series of business relationships and have conducted numerous business transactions. Some of those transactions involved ICA Services ("Services" or a defendant) and Signal Capital Holding Corporation ("SCHC" or a defendant) (collectively "the corporate defendants"). Eventually, Jones, Wolf, and Buckingham disagreed about virtually ev-ery aspect of their business dealings and relationships. As a result, they executed an Agreement in which each of them resolved to take certain actions, pay certain moneys, and release all claims against one another. Disputes then arose regarding the Agreement, and on June 29, 1999, Wolf and Buckingham filed an action in the Supreme Court of the State of New York, Westchester County, seeking a declaration of the Court to establish the parties' rights and obligations under the Agreement. On July 26, 1999, Jones filed the complaint in this action, and on March 23, 2000, Jones filed the amended complaint. Presently before the Court are Buckingham and Wolf's motion to dismiss pursuant to Rule 12(b)(1), and Forster's motion to dismiss pursuant to Rule 12(b)(6).

## I. BACKGROUND

### A. Counts I, II, and III

During and prior to 1994, Buckingham, Wolf, and John van Merkensteijn ("van Merkensteijn") were working under the trade name and style ICA International ("ICA"). They bought, sold, transferred, and otherwise dealt in the stock and assets of various businesses.

In May 1994, Buckingham, Wolf, and van Merkensteijn invited Jones and Howard B. Teig ("Teig") to work with ICA to acquire all of the issued and outstanding shares of stock in SCHC, a Delaware corporation with a principal place of business in Jericho, New York. It was understood that after its acquisition, SCHC would sell equipment trust interests that it owned. In connection with the acquisition of SCHC, the following business entities were formed: (1) Acorn Leasing Partners, L.P. ("Acorn"), a Delaware limited partnership; (2) Signal Capital Associates, Inc. ("SCAI"), a Delaware corporation; and (3) Signal Capital Associates, L.P. ("SCALP"), a Delaware limited partnership. In 1994, the stock of SCHC was acquired, and SCHC sold its equipment trust interests.

As of October 1, 1996, Jones and Buckingham were the only partners in Acorn. Jones was the general partner, and Buckingham was the limited partner. Acorn was a shareholder in SCAI; SCAI was one of several partners in SCALP; and SCALP was a shareholder in SCHC. In addition, SCHC was the nominal title holder to rights in contingent profits from rail car leases ("Additional Rent"). Pursuant to an oral agreement, Buckingham, Wolf, van Merkensteijn, Teig, and Jones ("Rent Owners") became the beneficial owners of the Additional Rent.

In October 1996, Buckingham and Jones had a series of conversations both in person and over the telephone. During those conversations, Buckingham told Jones that "he did not believe that Acorn's interest in SCAI could be exploited to any great advantage, but that he would like to 'draw a line' under the SCHC transaction and have Acorn and the other shareholders of SCAI dispose of their shares" (Amended Complaint ¶ 18). Buckingham also told Jones that he thought SCAI, SCALP, and SCHC should be restructured to create an advantageous federal tax basis in (1) the SCHC stock and (2) a foreign currency deposit that would be held by some of the partners in SCALP but not including SCAI. Buckingham also said that the values of the SCHC stock and the currency deposit as tax planning tools could then be marketed to other people. Buckingham indicated that Forster would market the SCHC stock, and Joseph Campagna ("Campagna") would market the currency deposit.

Buckingham proposed that Acorn sell its stock in SCAI to Forster for a sum of $1,000,000. Forster would pay Acorn a sum of $100,000 in cash and would pay the balance by a nonrecourse note, payable only out of the proceeds of the SCAI stock. According to Buckingham, "$500,000 would be payable on the completion of a transaction with the SCHC stock and $500,000 on completion of a transaction with the currency deposit." The amended complaint contends that Acorn therefore remained at risk for the success of Forster and Campagna's efforts.

On or about October 30, 1996, prior to accepting Buckingham's offer, Jones asked Buckingham whether he or Wolf was planning to retain control of the high basis SCHC stock or the currency deposit to use in future acquisitions, sales, or other business transactions. If Wolf and Buckingham used the stock or currency deposit in such a fashion, they would earn profits in addition to the money they made from the sale of their stock. Buckingham told Jones "(i) that [he] and Wolf would not make profits other than from the sale of their SCAI stock on the same terms as Acorn; (ii) that all of the other shareholders of SCAI would receive the same price per share for their stock in SCAI as would Acorn; and (iii) as part of the said restructuring of SCAI and SCALP, the rights to the Additional Rent would be separated from SCHC for the benefit of the Rent Owners" (Amended Complaint ¶ 21).

Jones accepted Buckingham's proposal and agreed that Acorn would sell its stock in SCAI to Forster for $1,000,000. Jones received a sum of $112,000.50 in cash. However, the note he received with the documents that gave effect to the sale was only in the amount of $637,500, rather than the expected amount of $887,500. Buckingham told Jones that he was receiving less money than he had anticipated because " 'the numbers had not worked out' " (Amended Complaint ¶ 22). Buckingham further assured Jones that he would receive the full balance of the sale price of $1,000,000 "if and when the transaction with the currency deposit was completed" (Amended Complaint ¶ 22). Thereafter, the above-described restructuring occurred, thus eliminating SCAI and SCALP.

In a telephone conversation held in January 1997, Buckingham told Jones that Forster had "contributed" the SCHC stock to TransTexas Corporation ("TransTexas") and had received TransTexas stock "and/or" cash in return (Amended Complaint

¶ 24). Subsequently, Forster paid Acorn the amount of the note plus interest.

The amended complaint alleges that the transaction between Forster and TransTexas was "only a preliminary transaction in a business reorganization enabling Wolf, Buckingham, and Forster to realize a substantial profit" (Amended Complaint ¶ 25). According to the amended complaint, Forster knew that the consideration TransTexas had paid for the SCHC stock was "inappropriately low" and conducted the transaction to realize a substantial profit.

In addition, Campagna purportedly used the currency deposit in a subsequent transaction with the Marriott Corporation that enabled Wolf and Buckingham to realize profits as well. Moreover, contrary to Buckingham's statement that the Additional Rent would remain separate from SCHC for the benefit of the Rent Owners, SCHC transferred the rights in the Additional Rent to TransTexas as part of the original transaction between SCHC and TransTexas.

The amended complaint contends that Buckingham's statements to Jones were false when he made them and were made to induce Jones, as the general partner of Acorn, to sell Acorn's stock in SCAI to Forster. According to the amended complaint, Buckingham would therefore be able to use SCAI's assets in a series of transactions that occurred in the months immediately following the transfer of Acorn's stock. Jones allegedly relied upon Buckingham's false statements.

It is alleged that Buckingham, Wolf, and Forster gained control of SCHC by first gaining control of SCAI and, then, by gaining control of SCALP. The three men used the high basis stock of SCHC and the high basis foreign currency deposit in highly profitable transactions without including Jones or Acorn. In May 1999, Teig received a memorandum indicating that the high basis stock had been used in fourteen additional transactions.

As of June 1, 1997, Buckingham assigned his partnership interest in Acorn to Linda L. McDonald ("McDonald"). As of December 29, 1997, McDonald sold that interest to Jones. In March 1998, Acorn assigned its claims against the defendants to Jones.

Count I of the amended complaint alleges that Buckingham, Wolf, and Forster violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10(b)–5, thereby causing damage to Jones. In Count II, Jones contends that, based on the above-described factual allegations, Buckingham, Wolf, and Forster are liable to him under a common law fraud theory. Count III contends that Buckingham is liable to Jones for breach of fiduciary duty, because as a partner in Acorn, Buckingham owed Jones and Acorn a fiduciary duty but (1) failed to disclose his plans to use the SCHC stock and the foreign currency deposit in a high profit business restructuring; and (2) acquired Acorn's business opportunity for his own personal gain.

### B. Count IV

The amended complaint alleges that GATX Capital Corporation ("GATX") agreed to transfer assets to SCHC to induce TransTexas to enter into the above-described transaction with SCHC. In return, SCHC assigned GATX rights in the Additional Rent. After SCHC and TransTexas completed their transaction, GATX transferred its rights in the Additional Rent to a corporation controlled by Buckingham, Wolf, van Merkensteijn, and Teig. According to the Amended Complaint, the transfers of the rights in the Additional Rent were made by SCHC and GATX without the knowledge or consent of Jones, who was a Rent Owner.

In addition, Services agreed to provide management services to SCHC in exchange for receiving part of the Additional Rent. The result of this service agreement has been to transfer a substantial interest in the Additional Rent to Services and,

thus, to Buckingham and Wolf, without Jones' knowledge or consent. "ICA, acting through Teig, has issued an assessment of the value of the Additional Rent, in which the Additional Rent payable through 2004 is projected to be approximately $78 million" (amended complaint ¶ 46). In Count IV of the amended complaint, the plaintiff alleges that all of the defendants are liable for damages for conversion.

## C. Counts V, VI, and VII

Count V contends that Buckingham and Wolf have breached a fiduciary duty to Jones by failing to disclose their plans to use the SCHC stock and the currency deposit in high profit business restructuring. According to Jones, Buckingham and Wolf owed him a fiduciary duty because they were partners with him in the business they carried out under the trade name and style of ICA or Inter–Market capital Associates.

In particular, in March 1995, Buckingham invited Jones to become a partner in ICA, or in ICA's future transactions, and promised Jones a one-sixth share in the profits and losses of the transactions. On or about December 31, 1995, van Merkensteijn retired as a partner in ICA. In May 1996, ICA changed its trading style to "Inter–Market Capital Associates," but retained the ICA acronym, allegedly to recognize the involvement of Jones, whose main commercial enterprise was Inter–Market capital Corporation, a New York Corporation.

Count VI contends that Buckingham and Wolf have not fully accounted to Jones for his share of the profits and transactions effected by ICA since Jones' admission as a partner. Alternatively, in Count VII, Jones alleges that if "[he], Buckingham, and Wolf are found not to have been general partners in the transactions effected by ICA, then Jones is entitled to an equitable share of the profits of the following transactions to which he made a contribution: Ourso; SMC; Gray Communica-

tions; and Nat West Leasing Corporation and any transactions effected using the trust structure put in place by Jones with First Union National Bank or its affiliates" (Amended Complaint ¶ 57).

## D. Count VIII

In connection with the SCHC transaction, Jones arranged for a subsidiary of Inter–Market Financial Corporation ("IMFC") to transfer a portfolio of equipment leased to municipalities in Britain (the "British Portfolio") to a predecessor of SCAI. Jones and Buckingham were directors and shareholders of IMFC at the time of the transaction. Buckingham and Wolf agreed with Jones that as partial consideration for the transfer, ICA would acquire for IMFC a portfolio of leased equipment equal or greater in value to the British Portfolio, which was worth a sum of approximately $633,444.

In November 1994, Buckingham and Jones agreed that in satisfaction of Jones' ICA involvement, ICA would repurchase the British Portfolio and transfer it to IMFC. "Jones agreed that the first $100,000 from the residual proceeds of the British Portfolio would be retained by the then current owners. The current owners have received the said $100,000 of residual proceeds" (Amended Complaint ¶ 60). ICA failed to transfer the British Portfolio to IMFC.

On February 1, 1998, IMFC assigned its rights against defendants to Jones. In Count VIII, Jones contends that Buckingham and Wolf, as partners in ICA, are liable to Jones for breach of contract.

## E. Count IX

Jones confronted Buckingham and Wolf with the allegations described above, and on or about May 23, 1997, Jones, Buckingham, and Wolf reached an agreement regarding their differences and reduced that agreement to writing (the "Agreement"). The Agreement provided that Jones would release his claims against Buckingham and

Wolf, provided that Buckingham and Wolf perform "certain of the terms of the Agreement agreed to be the essence of the Agreement (the 'Essential Terms')" (amended complaint ¶ 66).

The Essential Terms provided that Buckingham and Wolf would (1) cause Forster to transfer the First Leg Property to an entity designated by Jones; (2) transfer the British Portfolio to Acorn; (3) within 60 days of the date of the Agreement, transfer the Additional Rent to a trust in which Jones would have a 21.46% interest; and (4) transfer the sum of $1,100,000 in cash to Jones upon completion of a transaction involved in the Second Leg Property. The terms, "First Leg Property" and "Second Leg Property" are defined in the Agreement at paragraphs 2(ii) and 3(ii), respectively (see Amended Complaint, Exhibit 3).

The amended complaint contends that Wolf and Buckingham have: (1) refused to cause the transfer of the First Leg Property; (2) failed to cause the transfer of the British Portfolio and have refused to do so; (3) failed to cause the transfer of the Additional Rent to a trust, even though Jones has agreed to drafts of documents that would effect such a transfer; and (4) failed to transfer to Jones the sum associated with the Second Leg Property, despite the fact that the transaction involving that Property has occurred. Jones also alleges that Buckingham and Wolf have failed to provide the sales support and assistance required by the Agreement, "which while not one of the Essential Terms, was an important factor in Jones' willingness to enter into the Agreement" (Amended Complaint ¶ 71). According to Jones, the failure by Buckingham and Wolf to fulfill the Essential terms constitutes a material breach of the Agreement.

Presently before the Court are two motions to dismiss the amended complaint, one by Buckingham and Wolf for lack of subject matter jurisdiction and one by Forster for failing to state a claim. The Court treats the 12(b)(1) motion as a 12(b)(6) motion, because Buckingham and Wolf contend that the Court lacks subject matter jurisdiction on the ground that the federal question count of the amended complaint must be dismissed for failing to state a claim.

## II. DISCUSSION

The Court may not dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See King v. Simpson, 189 F.3d 284, 286 (2d Cir.1999); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir.1996). The Court must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Koppel v. 4987 Corp., 167 F.3d 125, 127 (2d Cir.1999); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. See Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995). The Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir.1999); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.1999).

### A. Acorn's Capacity to Sue

Defendants Wolf and Buckingham move to dismiss Count I of the amended complaint on the basis that Acorn did not have a federal securities fraud claim to assign to Jones. Wolf and Buckingham rely on Mannaberg v. Herbst, 45 N.Y.S.2d 197, 199 (N.Y.Sup.1943), for the proposition that a claim of fraud by one partner against another partner acting in concert with a third party does not belong to the partner-

ship but to the allegedly defrauded partner. Therefore, contend the defendants, the claim that Buckingham acted with Wolf and Forster to fraudulently dispose of partnership property does not belong to Acorn but to Jones. Buckingham and Wolf further argue that because Acorn had no federal securities fraud claim against them, it had nothing to assign to Jones. The defendants also point out that absent the assignment, Jones has no standing to sue because he did not buy or sell the securities at issue. Finally, the defendants conclude that because Jones is not the assignee of a securities fraud claim, Count I must be dismissed.

■ Contrary to the defendants' assertions, "[t]o determine whether a party has standing to raise a claim under Section 10(b), the court looks to federal rather than state law." *Frankel v. Slotkin*, 795 F.Supp. 76, 79 (E.D.N.Y.1992); *see Drachman v. Harvey*, 453 F.2d 722, 727 (2d Cir.1971) ("Federal law must be consulted to decide whether there is standing to sue under the Exchange Act."), *modified en banc on other grounds*, 453 F.2d at 736 (2d Cir.1972); *Glusband v. Fittin Cunningham Lauzon, Inc.*, 582 F.Supp. 145, 148–49 (S.D.N.Y.1984) ("[W]ith respect to the federal law claims, the plaintiff's capacity to sue under state law is irrelevant."). Thus the defendants' reliance on the state court decision in *Mannaberg* is misplaced. *See Drachman*, 453 F.2d at 727; *Glusband*, 582 F.Supp. at 148–49. *Cf. Schupak v. Florescue*, 1993 WL 256572 *3 (S.D.N.Y. 1993) (applying rule from *Mannaberg* to common law fraud cause of action).

■ Turning to federal law to determine whether Acorn could have asserted a securities fraud claim against Buckingham and Wolf, Rule 17(b)(1) provides, in relevant part, "[A] partnership or other unincorporated association, which has no ... capacity [to sue] by the law of the state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States."

Fed.R.Civ.P. 17(b)(1). Here, Acorn could have attempted to sue the defendants under the section 10(b) of the Exchange Act which is a law of the United States; *see* 15 U.S.C. § 78j. *See Glusband*, 582 F.Supp at 149 (finding that limited partnership had capacity to sue under the Securities Act and the Securities Exchange Act). Notably, Acorn had standing to sue under section 10(b), because it was the seller of the SCAI stock. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 358 (2d Cir.1990). Thus, even if Acorn lacked the capacity to sue, under *Mannaberg*, which this Court doubts in light of New York Civil Practice Law and Rules section 1025, *see* N.Y. CPLR § 1025 ("Two or more persons conducting a business as a partnership may sue or be sued in the partnership name."); *Oil & Gas Ventures–First 1958 Fund v. Kung*, 250 F.Supp. 744, 751 n. 24 (S.D.N.Y.1966) (noting that N.Y. CPLR § 1025 authorizes suit in partnership name; *Mannaberg* was decided prior to enactment of CPLR § 1025; and "[a] suit to redress a wrong to a limited partnership may be properly brought by a general partner in the partnership name"), Acorn can properly bring a securities fraud lawsuit pursuant to Rule 17(b)(1), because that Rule provides the partnership with the capacity to sue a partner and two third parties under the section 10(b). *See* Fed.R.Civ.P. 17(b)(1); *see also* 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1564 (stating that Rule 17(b)(1) enables partnership to sue under the Securities Exchange Act). Thus, the defendants' motion to dismiss Count I of the amended complaint, on the ground that Acorn lacked the capacity to sue, is denied.

## B. Acorn's Damages

■ The defendants claim, for the first time in their reply papers, that Acorn did not have a securities fraud claim that could be assigned to Jones because Acorn did

not suffer damages as a result of the sale of the securities. The defendants supply no factual allegations in support of their conclusory contention. In addition, the amended complaint contains allegations that Acorn suffered damages as a result of the defendants' conduct. In any event, in the Court's opinion, it is procedurally improper to raise an issue, such as this one, for the first time in reply papers, thereby precluding the plaintiff from offering a meaningful response. For all these reasons, the defendants' argument fails, and their motion to dismiss Count I of the amended complaint, on this basis, is denied.

### C. Acorn's Assignment of its Securities Fraud Claim

■ Defendants further contend that even if Acorn had a securities fraud claim, the assignment of that claim was invalid. Initially, the Court notes that federal law governs the assignability of claims under the federal securities laws. *See Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey,* 85 F.3d 970, 973 (2d Cir.1996). The majority of courts that have addressed the assignability of section 10(b) claims was presented with automatic assignments, rather than the express assignment present in the instant case. However, the courts faced with that issue have held that 10(b) claims are not automatically assignable. *See Smith v. Ayres,* 977 F.2d 946, 949–50 (5th Cir.1992); *Sanderson v. HIG P–XI Holding, Inc.,* 2000 WL 1042813 *9 (E.D.La.2000); *McEwen v. Digitran Sys., Inc.,* 49 F.Supp.2d 1293, 1300 (D.Utah 1999); *Small v. Sussman,* 1995 WL 153327 *9–10 (N.D.Ill.1995); *In re Saxon Securities Litig.,* 644 F.Supp. 465, 470–71 (S.D.N.Y.1985).

Generally, the courts that have held that 10(b) rights are not automatically assignable have relied on the Supreme Court's reasoning in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), which has been described as "[t]he guidepost case deter-

mining standing rules for 10b–5 actions." *Smith,* 977 F.2d at 949. In *Blue Chip,* the Supreme Court held that only a purchaser or seller of securities had standing to bring a 10b–5 suit. *See Blue Chip,* 421 U.S. at 755, 95 S.Ct. at 1934. The Court set forth two reasons for tightly restricting the availability of 10b–5 actions. First, the Court noted that to permit someone who was not the purchaser or seller of securities to bring a Rule 10b–5 actions would be contrary to the legislature's intent in enacting the law, which was to reduce the number of strike and nuisance suits. *See Blue Chip,* 421 U.S. at 740, 95 S.Ct. at 1927; *see also, Smith,* 977 F.2d at 950. The Supreme Court's second concern was the evidentiary problems inherent in allowing a non-purchaser or seller to testify that he had relied on a misrepresentation in deciding not to purchase or sell a security. *See Blue Chip,* 421 U.S. at 741–43, 95 S.Ct. at 1928–29; *Smith,* 977 F.2d at 950; *AmeriFirst Bank v. Bomar,* 757 F.Supp. 1365, 1371 (S.D.Fla.1991). The federal courts that have relied on the Supreme Court's reasoning in *Blue Chip* to conclude that a particular 10b–5 claim was not automatically assignable have found that if they were to permit the assignee to bring the 10b–5 lawsuit, the case would become exactly the type of action the Supreme Court was seeking to eliminate in *Blue Chip. See Smith,* 977 F.2d at 950;

Notably, the parties to the instant action have not provided the Court with a single case in which a federal court has held that the express assignment of a 10(b) claim is invalid. Nor has this Court found such a case. Rather, the Court has located only one case in which a federal court has ruled on the validity of an express assignment of a section 10(b) claim. *See AmeriFirst Bank v. Bomar,* 757 F.Supp. 1365 (S.D.Fla.1991). In *AmeriFirst,* the Southern District of Florida held that the a party's express and voluntary assignment of a portion of their Rule 10b–5 rights to AmeriFirst was valid because the express assignment at issue did not encourage

"strike" suits, did not transform the suit at hand into a nuisance, and did not introduce the evidentiary problems described in *Blue Chip. See AmeriFirst,* 757 F.Supp. at 1372.

The holding in *AmeriFirst* comports with the decisions of the courts that have ruled that 10b–5 claims are not automatically assignable, because those courts left room for the possibility that express assignments of the claims may be valid. *See Smith,* 977 F.2d at 950–51 ("We need not resolve and reserve for another day whether under other circumstances, some Rule 10b–5 claims may be expressly assigned."); *Lowry v. Baltimore & Ohio R.R.,* 707 F.2d 721 (3d Cir.1983) (in dicta, six of eight judges sitting en banc recognized the validity of an express assignment); *Sanderson,* 2000 WL 1042813 *9 (holding that although the 10b–5 rights in the case at hand were not automatically assigned by the transfer of the underlying security, "this case does not present a situation of express assignment of 10b–5 rights"); *McEwen v. Digitran Sys., Inc.,* 49 F.Supp.2d 1293, 1300 (D.Utah 1999) ("Absent a voluntary and express assignment of such claims by the injured party, an assignee does not become the beneficial holder of such claims."); *Small v. Sussman,* 1995 WL 153327 *13 (N.D.Ill.1995) (finding that the plaintiffs could not assign their 10b–5 claims by contracting to create an option to create an express assignment, and distinguishing the case from those involving a direct express assignment); *National Smelting,* 722 F.Supp. at 176 ("[I]t is by no means certain that a federal § 10(b) cause of action ... cannot be conveyed by an express assignment."); *Saxon Securities,* 644 F.Supp. at 471 (finding that 10b–5 claims may not be assignable except in limited circumstances, including the death of the purchaser or seller and cases in which privity exists between the purchaser or seller and the person asserting the rights); *Gardner v. Surnamer,* 608 F.Supp. 1385, 1390 (D.C.Pa.1985) (recognizing that an express assignment of section 10(b) claims may be possible).

■ Applying the reasoning of *Blue Chip* and *AmeriFirst* to the facts of this case, the Court finds that Acorn's assignment of its 10b–5 rights to Jones was valid, and, thus, Jones may assert those rights in this lawsuit. The instant express assignment of 10b–5 rights is unusual. First, a limited partnership expressly assigned its 10b–5 rights to its general partner. Second, the amended complaint indicates that the limited partnership never consisted of more than the general partner and one limited partner. In addition, by the time of the assignment, the only partner other than the general partner had sold his partnership interest to the general partner. Thus, from the facts alleged in the amended complaint it appears that the only person who retained an interest in Acorn at the time Acorn expressly assigned its 10b–5 rights was the general partner to whom Acorn assigned those rights.

■ Accordingly, due to the unusual circumstances of the instant express assignment, there is no likelihood that the assignment would deprive the true seller of the securities, who allegedly suffered the fraud, of its "cause of action and unduly benefit someone who had not been harmed." *National Smelting,* 722 F.Supp. at 176. Indeed, whenever a party voluntarily and expressly assigns its securities claim to another, "[t]he concern of depriving an injured party of the right to seek a remedy does not arise." *AmeriFirst,* 757 F.Supp. at 1371. In addition, permitting Jones a cause of action under Rule 10b–5 based on the express assignment from his limited partnership will not encourage strike suits. *See id.* at 1372. Nor will allowing Jones the right to pursue the litigation make the suit a nuisance. *See id.*

Finally, the evidentiary problems described in *Blue Chip* will not occur in the instant case, because Jones was the person who spoke to Buckingham; the misrepresentations that Buckingham allegedly made were made to Jones; and Jones allegedly relied upon those misrepresentations when he agreed to sell Acorn's stock

in SCAI. Indeed, had Acorn brought this action, Jones would have been the person testifying on behalf of the limited partnership. Thus, this Court finds that Acorn's express assignment of its Rule 10b–5 claim does not "contravene[ ] the policy considerations behind the standing requirements of *Blue Chip* and its progeny." *AmeriFirst,* 757 F.Supp. at 1371. As such, there is no reason why Acorn "should not be entitled to expressly assign [its] claim in accordance with the general rule that claims are legally assignable." *Id.* at 1371. Accordingly, the defendants' motion to dismiss Count I of the amended complaint on the ground that Acorn cannot assign its federal securities fraud claim is denied.

Defendants also argue that the assignment is collusive in violation of 28 U.S.C. § 1359, because the only reason for the assignment was "to invoke the jurisdiction of this Court for all Jones' state law claims" (Defendants' Reply Memorandum, p. 3). The defendants raise this argument for the first time in their reply brief, and, therefore, the plaintiffs have not had the opportunity to offer a meaningful response. In addition, without the benefit of discovery, the Court cannot determine with reasonable certainty whether the assignment was for a facially valid business purpose. *See Drexel Burnham Lambert Group, Inc. v. Galadari,* 777 F.2d 877, 881 (2d Cir.1985) (finding no collusion where assignment was for at least facially valid business purposes). At this stage of the litigation, the Court does not have any information regarding the assignment, other than its date. For these reasons, the defendants' motion to dismiss on the ground of a collusive assignment in violation of 28 U.S.C. § 1359 is denied with leave to renew upon the completion of discovery.

### D. The Securities Fraud Claim Against Wolf and Forster

Defendants Wolf and Forster, in separate motions, move to dismiss the section 10(b) and Rule 10b–5 claim against them on the ground that, as a result of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), they cannot be secondarily liable for violations of the federal securities laws. Furthermore, contend these defendants, the plaintiff has failed to allege facts sufficient to show that they were primary actors, and thus, the securities fraud cause of action against them must be dismissed.

In *Central Bank, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that section 10(b) does not reach aiders and abettors. The Court found that section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Central Bank,* 511 U.S. at 177, 114 S.Ct. at 1448. The Court reasoned, among other things, that if section 10(b) and Rule 10b–5 allowed for an aiding and abetting cause of action, liability would "be imposed irrespective of any showing of reliance on the defendant's misstatements, a requirement that plaintiffs must satisfy in order to recover under Rule 10b–5." *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 842 (2d Cir.1998) (citing *Central Bank,* 511 U.S. at 178, 114 S.Ct. at 1449).

In addition, the Second Circuit has held that "the effect of the Supreme Court's decision in *Central Bank* is to bar a cause of action for conspiracy to violation ¶ 10(b) and Rule 10b–5." *See Dinsmore,* 135 F.3d at 842–43. Indeed, "a conspiracy cause of action would ... render irrelevant the question of whether plaintiffs relied on any misstatements or omissions by the defendant being sued." *Id.* at 843, 844. Although the Second Circuit "decline[d] to

imply a cause of action for conspiracy to violate ¶ 10(b) and Rule 10b–5, [it found that] secondary actors who conspire to commit such violations will still be subject to liability so long as they independently satisfy the requirements for primary liability." *Id.* at 842. Thus, " '[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met.' " *Dinsmore*, 135 F.3d at 843 (quoting *Central Bank*, 511 U.S. at 191, 114 S.Ct. at 1455).

■ Applying these standards to the amended complaint in this case, the Court finds that the plaintiff has failed to state a section 10(b) or a Rule 10b–5 claim against Wolf and Forster. The amended complaint alleges that in October 1996, Buckingham proposed to Jones that Acorn should sell its stock in SCAI to Forster for a sum of $1,000,000. On or about October 30, 1996, Buckingham told Jones: "(i) that [he] and Wolf would not make profits other than from the sale of their SCAI stock on the same terms as Acorn; (ii) that all of the other shareholders of SCAI would receive the same price per share for their stock in SCAI as would Acorn; and (iii) as part of the said restructuring of SCAI and SCALP, the rights to the Additional Rent would be separated from SCHC for the benefit of the Rent Owners" (Amended Complaint ¶ 21). The plaintiff contends that these statements were false when they were made, and that Jones relied upon them when he agreed, as the general partner of Acorn, to sell Acorn's stock in SCAI to Forster. Lastly, the amended complaint states, "Both Wolf and Forster conspired with Buckingham to defraud Acorn out of its interest in the SCAI stock and together with Buckingham utilized the mails, telephones and other instrumentalities of interstate commerce to accomplish same" (Amended Complaint ¶ 32).

These assertions are insufficient to state a section 10(b) and a Rule 10b–5 claim against Wolf and Forster, because they do not allege that either of those men used a manipulative device or made a material misstatement upon which Jones relied in agreeing to sell Acorn's stock in SCAI. Rather, according to the amended complaint, the only misstatements upon which Jones relied were those made by Buckingham. The fact that Forster purchased the securities from Acorn and the fact that Wolf may have ultimately benefitted from Acorn's sale of the securities are insufficient allegations of primary liability under section 10(b) and Rule 10b–5. A showing of reliance is missing from the plaintiff's allegations regarding the conduct of Wolf and Buckingham, and reliance is a material requirement in establishing liability under section 10(b) and Rule 10b–5. *See Dinsmore*, 135 F.3d at 842. Thus, the amended complaint fails to state a federal securities fraud claim against Wolf and Forster because those defendants cannot be found liable under theories of aiding and abetting or conspiracy, and the amended complaint does not contain a sufficient showing of their primary liability. Accordingly, the defendants' motion to dismiss the section 10(b) and Rule 10b–5 claim against Wolf and Forster is granted, and Count I is dismissed as against those defendants.

**E. Supplemental Jurisdiction Over Counts V through IX**

Defendants Wolf and Buckingham move to dismiss Counts V through IX of the amended complaint on the ground that the Court should not exercise supplemental jurisdiction over those counts because they do not arise out of the same case and controversy as the federal securities fraud claim. According to Wolf and Buckingham, Acorn's sale of its SCAI stock, the event at issue in Counts I through IV, is not a factor in Counts V, VI, or VII. Wolf and Buckingham also complain that Count VIII pertains to a

contract that does not relate to Acorn's sale of its SCAI stock. Finally, the defendants assert that Count IX deals with the Settlement Agreement, which was formed to resolve business disputes between the parties. The defendants argue that the Settlement Agreement is the subject of a declaratory judgment action initiated by the defendants in the Supreme Court of the State of New York, Westchester County.

■ Section 1367(a) gives the Court "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." State and federal claims form "one case or controversy" when they "derive from a common nucleus of operative facts or when both claims would normally be expected to be tried in a single judicial proceeding." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Nevertheless, the grant of supplemental jurisdiction is vested in the sound discretion of the court. 28 U.S.C. § 1367(c). In particular, the district court may decline to exercise jurisdiction over a claim under subsection (a) if "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

■ The Court finds that the plaintiff's state law claims arise out of the same case or controversy as his federal claim. All of the claims at issue in this case arose from the same series of business transactions involving. The business transactions were interrelated and involved the creation and destruction of various partnerships and corporations, many of which owned interests in each other. In addition, the parties' Agreement pertained to all of the disputes that had arisen between them during their long-standing and complicated business relationships. The state law claims clearly arise out of the same nucleus of operative facts. As such, in the exercise of its discretion, the Court will retain jurisdiction over the remaining state law claims in the interests of judicial economy. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

**F.  Conspiracy to Defraud**

■ Defendant Forster moves to dismiss the common law fraud and conversion counts against him on the ground that they fail to state a claim for relief. It is clear that Jones fails to state a claim for fraud against defendant Forster alone, because there is no allegation anywhere in the amended complaint that Forster made any representation, fraudulent or otherwise, to the plaintiff. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997) (holding that under New York law, a defendant must make a material misrepresentation or omission of fact, among other things, to be liable for fraud); *Vasile v. Dean Witter Reynolds, Inc.,* 20 F.Supp.2d 465, 482 (E.D.N.Y.1998) (dismissing cause of action for common law fraud, because plaintiff failed to plead a material misrepresentation or omission of fact, which is the initial element of fraud). Apparently recognizing this deficiency, Jones asserts that "Wolf and Forster conspired with Buckingham to defraud Acorn out of its interest in the SCAI stock" (amended complaint ¶ 32).

■ In New York state, there is no independent cause of action for conspiracy to commit fraud. *See MBF Clearing Corp. v. Shine,* 212 A.D.2d 478, 479, 623 N.Y.S.2d 204, 205–06 (1st Dept.1995). However, a claim of conspiracy may lie where an underlying tort of fraud has been adequately pleaded. *See Vasile,* 20 F.Supp.2d at 482. To plead fraud sufficiently, a plaintiff must allege: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) such reliance causes damage to the

plaintiff. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997). The amended complaint contains allegations of each of the elements of fraud. Thus, the only question is whether the amended complaint contains proof of an agreement to engage in a common scheme or plan to deprive Acorn of its property. *See AM Cosmetics, Inc. v. Solomon,* 67 F.Supp.2d 312, 321 (S.D.N.Y. 1999) ("Plaintiffs may plead the existence of a conspiracy in order to connect the actions of the individual Defendants with an actionable, underlying tort, and establish that those actions were part of a common scheme."); *Elghanian v. Harvey,* 249 A.D.2d 206, 207, 671 N.Y.S.2d 266, 266 (1st Dept.1998); *Truong v. AT & T,* 243 A.D.2d 278, 278, 663 N.Y.S.2d 16, 17 (1st Dept. 1997); *Ferguson v. Meridian Distribution Srvcs., Inc.,* 155 A.D.2d 642, 642, 548 N.Y.S.2d 233, 234 (2d Dept.1989); *Schlotthauer v. Sanders,* 143 A.D.2d 84, 85, 531 N.Y.S.2d 334, 336 (2d Dept.1988).

▋ Viewing the facts in the light most favorable to the plaintiff, an agreement to engage in a fraudulent scheme can be inferred from the facts pleaded in the amended complaint. In particular, Jones alleges that Buckingham approached him seeking his agreement to sell Acorn's SCAI stock. Jones states that he agreed with Buckingham to sell the stock based on certain assurances Buckingham made to him, including a statement that neither Buckingham nor Wolf would make money in addition to the money they were making from the sale of their SCAI stock. Acorn then sold the Stock to Forster. Although the amended complaint states that Forster paid Acorn in full for the sale of the stock, the plaintiff alleges that Buckingham, Wolf, and Forster used Acorn's SCAI stock to help them gain control of SCAI, SCALP, and eventually SCHC. Once they had control of SCHC, the three men could were able to execute highly profitable transactions without having to include Jones or Acorn.

From these facts, it may be inferred the Forster agreed with Buckingham and Forster to engage in a common scheme or plan to defraud Acorn of its SCAI stock. By asserting that he agreed to sell Acorn's SCAI stock to Forster based on Buckingham's statements, Jones has connected Forster to the fraudulent representations. *See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.,* 85 F.Supp.2d 282, 299 (S.D.N.Y.2000) (suggesting that where plaintiff connects a co-defendant to the fraudulent misrepresentations, a cause of action for conspiracy to defraud may lie). It is inferable that Forster was aware of the fraudulent misrepresentations because he had been Buckingham's business partner for many years, and because he purchased $1,000,000 worth of stock following Buckingham's statements to Jones. *See Odyssey,* 85 F.Supp.2d at 299 (noting that an assertion that the co-defendant was aware of the fraudulent representations would support a finding that the plaintiff had adequately alleged conspiracy to defraud). Indeed, there is a factual basis for finding a conscious agreement among the three individual defendants. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26, n. 4 (2d Cir.1990) (holding that although pleading of conspiracy to defraud is measured under the more liberal standards of Rule 8(a), the complaint "must allege some factual basis for a finding of a conscious agreement among the defendants"). As such defendant Forster's motion to dismiss the count alleging conspiracy to defraud is denied.

#### G. Conspiracy to Convert

On the other hand, the Court finds that the plaintiff failed to state a claim against Foster for conspiring to convert Acorn's property. As stated above, in New York, there is no independent cause of action for conspiracy, but a claim for conspiracy may lie where the underlying tort has been pleaded. *See Vasile,* 20 F.Supp.2d at 482; *Chemical Bank v. Ettinger,* 196 A.D.2d 711, 715, 602 N.Y.S.2d 332, 336 (1st Dept. 1993) (finding that there is no independent

cause of action for conspiracy to convert); *MBF Clearing Corp. v. Shine*, 212 A.D.2d 478, 479, 623 N.Y.S.2d 204, 205 (1st Dept. 1995) (same). Here, the claim for conspiracy to convert must fail because of the failure of the conversion claims. *See Ettinger*, 196 A.D.2d at 715, 602 N.Y.S.2d at 336.

■ A plaintiff properly alleges the tort of conversion by showing that he owns and has a right to possess personal property, but that the property is in the "unauthorized possession of another who has acted to exclude the rights of the owner." *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dept. 1995); *see Employers' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 105, 156 N.E. 629, 630 (1927) ("Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."). When the property at issue is money, it must be "specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." *Republic of Haiti*, 211 A.D.2d at 384, 626 N.Y.S.2d at 475; *Ettinger*, 196 A.D.2d at 715, 602 N.Y.S.2d at 336 (holding that plaintiff failed to state a claim for conversion where the funds he claimed had been converted were not sufficiently identifiable in relation to the bank's other funds). Although specifically identifiable moneys may be converted, there is no cause of action for conversion of intangible property under New York law. *See Sporn v. MCA Records*, 58 N.Y.2d 482, 489, 462 N.Y.S.2d 413, 415, 448 N.E.2d 1324 (1983); *MBF Clearing Corp.*, 212 A.D.2d at 479, 623 N.Y.S.2d at 206 (dismissing plaintiff's cause of action for conversion of its "time, assets, associations, employees' services and equipment," because cause of action for conversion of intangible property does not exist); *Rao v. Verde*, 222 A.D.2d 569, 570, 635 N.Y.S.2d 660, 661 (2d Dept.1995) (no cause of action lies for conversion of intangible property); *Star Contracting Co., Inc. v. McDonald's Corp.*, 201 A.D.2d 721, 721, 608 N.Y.S.2d 327, 327 (2d Dept. 1994) (same).

■ The Court finds that the amended complaint fails to state a claim for the underlying claim of conversion, and therefore, the conspiracy to convert cause of action must be dismissed. Jones alleges that the defendants conspired to convert his rights in the Additional Rent. Additional Rent refers to rights in contingent profits from rail car leases and, thus, constitutes intangible property. Because a cause of action for conversion of intangible property is not actionable under New York law, the plaintiff has failed to state a claim for conversion. *Sporn*, 58 N.Y.2d at 489, 462 N.Y.S.2d at 415, 448 N.E.2d 1324; *MBF Clearing Corp.*, 212 A.D.2d at 479, 623 N.Y.S.2d at 206; *Rao*, 222 A.D.2d at 570, 635 N.Y.S.2d at 661; *Star Contracting*, 201 A.D.2d at 721, 608 N.Y.S.2d at 327. As such, the Court grants defendant Foster's motion to dismiss Count IV of the amended complaint as against defendant Foster.

### III.  CONCLUSION

Having reviewed the parties' submissions it is hereby

**ORDERED,** that the motion to dismiss Count I of the amended complaint is **GRANTED,** with respect to defendants Wolf and Forster, and it is further

**ORDERED,** that the motion to dismiss Count I of the amended complaint is **DENIED,** with respect to defendant Buckingham, and it is further

**ORDERED,** that the motion to dismiss Count II of the amended complaint is **DENIED,** and it is further

**ORDERED,** that the motion to dismiss Count IV of the amended complaint is **GRANTED,** with respect to defendant Forster.

**SO ORDERED.**