**DOVER LIMITED and Wendy Sui Cheng Yap, Plaintiffs,**

v.

**A.B. WATLEY, INC., et al., Defendants.**

No. 04 Civ. 7366(FM).

United States District Court, S.D. New York.

March 28, 2006.

Thomas M. Mullaney, Law Offices of Thomas M. Mullaney, New York, NY, for Plaintiffs.

Sameer Rastogi, Sichenzia Ross Friedman Ference, LLP, New York, NY, Joshua S. Krakowsky, Dechert, LLP, New York, NY for Defendants.

Alain Assemi, Morgan Hill, CA, pro se.

### MEMORANDUM DECISION

MAAS, United States Magistrate Judge.

### I. *Introduction*

Plaintiffs Dover Limited ("Dover") and Wendy Sui Cheng Yap ("Yap") (together, "Plaintiffs") bring this action for money damages and other relief alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), and Rule 10b–5. (*See* Docket No. 25 (Amended Complaint ("Am.Compl."))). Plaintiffs also assert claims for common law fraud, conspiracy to commit fraud, conversion, breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation. The defendants are A.B. Watley, Inc. ("ABW"); A.B. Watley Group, Inc. ("Group"); A.B. Watley Direct, Inc. ("Direct") (together, the "ABW Com-

panies"); Robert Malin ("Malin"), the President of ABW; John J. Amore ("Amore"), ABW's former Chief Executive Officer; two ABW employees, Keith Sorrentino ("Sorrentino") and John Coakley ("Coakley") (together, the "ABW Defendants"); Elfort Company, S.A. ("Elfort"),[1] an affiliate of ABW; and Alain Assemi ("Assemi"), who is alleged to be an agent of ABW and principal in Elfort. (*See* Docket No. 25). Malin, Amore, Sorrentino and Coakley are hereinafter referred to, collectively, as the "Individual Defendants." The ABW Companies, Malin, Amore, Sorrentino, Coakley and Assemi are hereinafter referred to, collectively, as the "Defendants."

In three separate motions, the Defendants now have moved to dismiss the Amended Complaint, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b), for failure to state a claim or plead with the requisite particularity. (Docket Nos. 39, 41, 42, 44).[2]

In November 2004, the parties consented to my exercise of jurisdiction over this matter pursuant to 28 U.S.C. § 636(c). (*See* Docket No. 13). Pursuant to that authority, for the reasons set forth below, the motions filed by the ABW Defendants and Assemi are granted in part and denied in part. Additionally, Amore's motion is granted. The Plaintiffs' request for leave to amend the Amended Complaint also is granted insofar as the defects set forth in this Motion to Dismiss can be corrected through repleading.

## II. Background

### A. Relevant Facts

The following facts alleged in the Amended Complaint must be taken as true.

#### 1. Parties

Plaintiff Dover is a Singapore corporation in the business of "investment holding," and plaintiff Yap is a resident of Singapore and director of Dover. (Am. Compl. ¶¶ 3–4 & Ex. B at 8).

At all relevant times, ABW was a broker-dealer and retail securities firm, incorporated and having its principal place of business in New York. (*Id.* ¶ 5). Group and Direct also were broker-dealers and retail securities firms operated by the same employees and conducting the same business out of the same location as ABW. (*Id.* ¶¶ 6–7).

Amore served as Chief Executive Officer of ABW until September 2003. (*Id.* ¶¶ 11, 49). Malin was the President of ABW and Group. (*Id.* ¶ 8). Sorrentino and Coakley were ABW employees. (*Id.* ¶¶ 9–10).

Assemi was the sole principal of Elfort, a California company affiliated with ABW. (*Id.* ¶¶ 12–13). Each of the individual defendants was also a licensed securities broker. (*Id.* ¶¶ 8–12).

#### 2. Fraudulent Scheme

On or about May 25, 2003, Yap discussed with Assemi the prospect of Dover investing $10 million in a "Non–Depletion

---

**1.** The Amended Complaint originally named Elfort, which was alleged to be "an alter-ego of defendant Assemi" as a defendant. Subsequently, the plaintiffs voluntarily dismissed all their claims against Elfort on March 25, 2005. (*See* Docket No. 35).

**2.** One motion was filed on behalf of the ABW Defendants (Docket Nos. 39, 42) and another on behalf of Amore (Docket Nos. 41, 44). Assemi, who is proceeding *pro se*, also has served a motion to dismiss, although neither his motion nor his memorandum of law appear to have been docketed when served (Docket No. 47).

of Capital Growth Program" ("Non–Depletion Account" or "Account") allegedly offered by ABW in the United States. (*Id.* ¶ 23). Assemi told Yap that Dover's investment was guaranteed by ABW not to deplete or depreciate, and that Dover would realize a profit of no less than $5 million by September 15, 2003, four months after the funds were received. (*Id.* ¶ 24). In exchange for the assurance of this high return and security, Dover was to split the profits received with ABW. Assemi, in turn, was to be paid directly by ABW. (*Id.* ¶ 25).

Assemi's statements to Yap about the account were false because ABW did not offer a Non–Depletion Account to its customers, nor did it have an investment program which guaranteed the security of its customers' funds while also affording them a high rate of return within six months.[3] (*Id.* ¶ 33). Worse yet, at the time these misrepresentations were made, the Defendants intended to invest Dover's money in high risk, speculative securities, if invested at all. (*Id.* ¶ 35).

On May 26, 2003, Yap completed the ABW Account Application and Registration forms necessary to open an account for Dover and faxed them to Sorrentino. (*Id.* ¶ 27 & Ex. B). After making certain corrections and changes to the forms requested by Sorrentino, Yap forwarded the fully executed application to him on May 29, 2003. (*Id.*).

On June 4, 2003, at 2:00 a.m. (Singapore time), Coakley called Yap and explained that ABW's "legal department" required that she change the Dover application to indicate that its investment objective was not "Growth," but "Aggressive Growth/Speculation." (*Id.* ¶ 29 & Ex. B). Coakley insisted that Yap fax the revised form immediately, even though it was the middle of the night in Singapore. (*Id.* ¶ 30). Within minutes after she finished talking to Coakley, Assemi called Yap to ensure that she would fax the form immediately. (*Id.*).

On June 5, 2003, Coakley sent Yap a fax containing a copy of the amended account opening form, along with same-day instructions for the transfer of Dover's funds into the Account. (*Id.* ¶ 31). Later that day, the Plaintiffs faxed the same documents to Sorrentino, along with "two (2) amended pages for the ABW account application indicating the demanded change from 'Growth' to 'Aggressive Growth.'" (*Id.*). Coakley's statements to Yap were false, because Dover did not need to list "Aggressive Growth/Speculation" as its objective in order to open a Non–Depletion Account, or any other account, with ABW. (*Id.* ¶ 34).

That same day, pursuant to Sorrentino's instructions, Yap transferred $10 million to ABW. (*Id.* ¶ 32). Yap also executed and returned an ABW Profit Split Agreement that Coakley had requested. (*Id.*). The next day, Coakley faxed to Yap a PFS Limited Trading Authorization naming Amore as Plaintiffs' authorized agent. (*Id.*). The Amended Complaint does not state that Yap signed and returned this authorization, but it appears that she did.

By June 17, 2003, Yap received an ABW account statement indicating the "loss or absence" of $2,667,739 from the Account for the seven-day period from June 6 to June 13, 2003. (*Id.* ¶ 39). ABW apparently had allocated this sum to a margin account, not owned by Yap or Dover, that sold certain shares of J.P. Morgan Chase stock on June 1, 2003. (*Id.* ¶ 40). Similar-

---

**3.** Although the Amended Complaint states that YAP was promised a $5 million return in four months, it also indicates that Assemi represented that the Account would provide a high rate of return within *six* months. (*Id.*).

ly, when Yap received a statement for the Account for the period from June 1 through June 30, 2003, it reflected an opening account value of only $6,988,859.84, more than $3 million less than Dover had remitted. (*Id.* ¶ 32).

Upon learning of the initial loss in the Account, Yap called Assemi, who told her that the loss shown on the statement was due to a "computer error" which he would ensure was corrected by the end of the week. (*Id.* ¶ 41). Assemi further advised Yap that the Account actually had an " 'equity' value of approximately $15 million and that ABW was going to 'piggy back' Dover's 'equity' to 'other's equity' to obtain a total of $50 million and then enter Dover into a 'bigger payout program.' " (*Id.*).

Despite these assurances, on July 13, 2003, Plaintiffs received a letter from ABW, dated July 3, 2003, which stated that the Account had "declined in value from $10,000,000 to $7,005,173.90." (*Id.* ¶ 42). The letter requested that Yap sign and return the letter to ABW. (*Id.*). Instead, Yap contacted Assemi, who sent her a fax the following day, which stated that the letter she had received from ABW did not require her signature and that she should "rest assured that [ABW] is responsible and accountable for [the] funds remaining at their establishment." (*Id.* ¶ 43 & Ex. C). The letter stated further that, "Mr. Robert Malin, the president of [ABW], assured me this morning that they will be depositing profits into your account." (*Id.* Ex. C). Assemi also wrote that Yap's "$6.75 [million] ha[d] been transferred to a non-deplet[ion] account," and that "[she would] be more than pleased after [her] great patience." (*Id.*).

On or about July 15, 2003, Assemi explained to Yap that the program had been

slow to generate the promised profits, because the total amount invested had to be at least $25 million. (*Id.* ¶ 45). On July 30, 2003, because Dover had yet to receive any profits, Yap sent Assemi an email in which she reminded him of his promise that Dover would be "paid under ABW account end of July." (*Id.* Ex. D). Yap's email also stated that "nothing ha[d] come in yet and [Dover had] not received confirmation regarding [$] 3.25 [million] balance in ABW." (*Id.*). Later that day, Assemi emailed Yap that he had been unsuccessful in trying to reach her and that "at [the] absolute latest [August] 15th you can take $5 [million] profit." (*Id.*).

In an "urgent" email dated September 11, 2003, Yap advised Assemi that Dover "still [had] not received any funds from the Programs," and that if $5 million were not remitted by September 16, Dover would send a letter requesting the entire $10 million investment be returned. (*Id.* Ex. E at 6–7). In a follow-up email the next day, Yap explained that she needed the money by September 16 because of an "investment option that [she had] to exercise." (*Id.* at 8). Shortly after these emails, Assemi informed Yap that ABW had terminated Amore due to his "reckless trading, including reckless trading of Dover's account." (*Id.* ¶ 49).

When Dover's money had not been returned by late September 2003, Yap wrote to ABW and demanded that the balance of the original $10 million investment, or $3,250,000, be returned to Dover, and that she wished to terminate Dover's participation in the Non–Depletion Capital Growth program. (*Id.* ¶ 50). On September 25, 2003, Yap received from ABW's counsel, Michael H. Ference, Esq. ("Ference"), a letter responding to her demand.[4]

---

4. Ference's firm, Sichenzia Ross Friedman Ference, LLP, also represents the ABW De- fendants in this action.

(*Id.* ¶ 51). In his letter, Ference wrote that ABW "does not offer any service or product titled 'Non–Depletion of Capital Growth,'" and that he was "at a complete loss" as to how Yap could request the return of the balance of $10 million since the Account balance was less. (*Id.*). Despite this letter, however, Yap continued to receive oral and written assurances from Assemi and Malin that ABW would return the full amount that Dover had originally invested through further trading. (*Id.* ¶ 53).

By letter dated September 26, 2003, Yap replied to Ference's letter and described "ABW's representations to her that Dover's $3 million was not lost, but was available to ABW to [invest to] make Dover 'lots of money.'" (*Id.* ¶ 52). Neither Ference nor ABW responded to this letter. (*Id.*).

On June 2, 2004, Yap (and two of her relatives) met with Assemi and Steven Malin (Robert Malin's brother). (*See id.* Ex. F at 3). Prior to the meeting, Assemi had sent to Yap a "Restitution Proposal" prepared by Robert Malin "to remedy the financial chaos that Jay Amore ha[d] left behind in his wake." (*Id.* at 1). According to Assemi, Malin had agreed to produce to Yap information concerning the FBI/NASD investigation of Amore and ABW's pending lawsuit against him, in exchange for the retention of Dover's remaining funds at ABW, which would trade them, with the returns applied against Dover's balance and an offer of shares in ABW "before an anticipated increase in value within the next year." (*Id.*).

Steven Malin allegedly was present on June 2 because Robert Malin "had to attend another meeting." (*Id.* at 3). During the meeting, Steven Malin told Yap that ABW had insurance which might cover the Plaintiffs' investments. (*Id.*). He also suggested using the balance of Dover's

funds as part of a "private placement," which, together with more funds from Dover, might enable ABW to return all of Dover's money in two years or more. (*Id.*). Yap believed that this differed from what Assemi previously had told her, which was that Dover would see a return on its investment within six months to one year without investing more money. (*Id.*). Throughout the meeting, "[Assemi] had nothing to say even though [what Steven Malin said] contradicted what [Assemi previously told Yap]." (*Id.* at 4).

On August 27, 2004, the National Association of Securities Dealers ("NASD") expelled ABW and revoked its license for "fail[ure] to pay [$26,000 in] fines and ... costs" in connection with two prior disciplinary actions. (*Id.* Ex. A at 3 (block capitalization deleted)). In one of those proceedings, ABW was found to have failed to comply with securities disclosure requirements; in the other, it was found to have run advertising that "contained statements which were exaggerated, misleading, unwarranted, and without basis." (*Id.* at 9–10 (block capitalization deleted)). The Plaintiffs allege that ABW was expelled on or about April 4, 2004 (*see id.* ¶ 19), but that neither Malin nor Assemi informed Yap of the revocation or the pending rebirth of ABW as Direct or Group. (*Id.* ¶ 56). The NASD report annexed to the Amended Complaint indicates, however, that the "revocation/expulsion" did not occur until August 27, 2004, two months after the meeting. (*See id.* Ex. A at 5).

During the June 2 meeting, Yap rejected the ABW restitution proposal and requested that the balance in the Account be returned immediately. (*Id.* ¶ 61). On June 10, 2004, ABW returned the balance. (*Id.*). Yap contends that ABW, rather than Amore, misallocated or converted Dover's funds, resulting in a net loss of

$2,994,597.84, excluding interest. (*Id.* ¶¶ 62–63).

### 3. *Subsequent Events*

On June 25, 2004, Plaintiffs' counsel asked Ference whether the reference to mandatory arbitration in the Account opening forms was binding, because the Plaintiffs preferred to seek restitution in federal court. (*Id.* ¶¶ 64–65 & Ex. B (Customer Agreement) §§ 12–13). Plaintiffs' counsel also asked Ference whether ABW was still in business. (*Id.* ¶ 69).

The response from ABW's counsel, dated July 9, 2004, enclosed a copy of Dover's Customer Agreement and directed opposing counsel's attention to Section 13 thereof, which provided for mandatory arbitration. (*Id.* ¶ 66 & Ex. B). Counsel's letter also stated that ABW "will consent to arbitrate any such claims before the NASD." (*Id.* ¶ 66 & Ex. A at 5). As a result, Plaintiffs refrained from filing a suit in this Court and "instead futilely expended time, effort, and money filing an arbitration demand with the NASD," which was not the proper forum once ABW's membership was terminated by the NASD on August 27, 2004. (*Id.* ¶ 68).

The Plaintiffs eventually commenced this action by the filing of their Complaint on September 15, 2004. (Docket No. 1). After the Defendants moved to dismiss the Complaint on various grounds, the Plaintiffs filed the Amended Complaint which mooted those motions. (Docket No. 25). The present round of motion practice then ensued.

### 4. *Claims for Relief*

Counts I and II of the Amended Complaint allege violations of the Exchange Act. In Count I, the Plaintiffs claim that all of the Defendants violated Section 10(b) of the Act, and Rule 10b–5 thereunder, by engaging in a scheme to induce the Plain-tiffs to invest $10 million in a fictitious Non–Depletion Account. (*See* Am. Compl. ¶¶ 70–86). Count II alleges that the Individual Defendants are liable under Section 20(a) of the Securities Act for the violations alleged in Count I. (*Id.* ¶¶ 87–91).

Counts III through V of the Amended Complaint allege various state law claims against all of the Defendants. Count III alleges that the Defendants committed fraud by purporting to invest the Plaintiffs' money in a Non–Depletion Account, which would provide complete security from loss while also achieving favorable rates of return. (*Id.* ¶¶ 92–107). Count IV charges that the Defendants conspired together, and with Elfort, to commit the fraud alleged in Count III. (*Id.* ¶¶ 108–17). Count V alleges that the Defendants converted and misappropriated the Plaintiffs' investment. (*Id.* ¶¶ 118–28).

Counts VI and VII name only ABW as the defendant. Count VI alleges that ABW breached its agreement with the Plaintiffs to invest Dover's $10 million in a Non–Depletion Account and produce a return of no less than $5 million dollars by September 15, 2003. (*Id.* ¶¶ 129–34). Count VII alleges that ABW breached the implied covenant of good faith and fair dealing in connection with the agreement described in Count VI. (*Id.* ¶¶ 135–38).

Finally, Count VIII alleges that all of the defendants negligently misrepresented that they would invest the Plaintiffs' $10 million in a manner which would ensure a profit of $5 million by September 2003. (*Id.* ¶¶ 139–45).

### III. *Standard of Review*

The Defendants have moved to dismiss the Amended Complaint, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 621 (S.D.N.Y.2003) (quoting *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999)). In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). The Court may grant the motion only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In deciding a motion to dismiss, the Court may deem a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, . . . as well as public disclosure documents required by law to be, and that have been, filed with [regulatory agencies], . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000) (internal citations omitted); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (same); *Marcus v. Frome*, 329 F.Supp.2d 464, 468 (S.D.N.Y.2004) (citing *Chambers* ).

■ Rule 9(b) requires that allegations of fraud, including securities fraud, be stated with particularity. The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are to: (1) provide the defendant with fair notice of the claims; (2) protect the defendant from harm to his reputation or good will by unfounded allegations of fraud; and (3) reduce the number of strike suits. *Pits, Ltd. v. Am. Express Bank Int'l*, 911 F.Supp. 710, 714 (S.D.N.Y.1996). Under Rule 9(b), "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally." Fed. R. Civ. Proc. 9(b). Nevertheless, an allegation of fraud in a complaint must specify: (1) those statements the plaintiff thinks were fraudulent; (2) the speaker; (3) the time and place the statements were made; and (4) why the plaintiff believes the statements were fraudulent. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995); *see also McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992).

■ Finally, the PSLRA is applicable to the Plaintiffs' Exchange Act claims. *See* 15 U.S.C. § 78u–4(a)(1). The PSLRA requires that the complaint in any action brought by a private plaintiff under the Exchange Act specify each statement alleged to have been misleading and why the statement was misleading. *Id.* § 78u–4(b)(1). Additionally, if an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts on which that belief is formed. *Id.* While the Exchange Act requires a defendant to have acted with a particular state of mind before a private plaintiff may recover money damages, the PSLRA further requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). As former Judge Martin noted:

> The "strong inference" requirement has been held to mean that plaintiffs are entitled to only the "most plausible of competing inferences." *In re Champion*, 145 F.Supp.2d 871, 877 (E.D.Mich. 2001) (citing *Helwig v. Vencor*, 251 F.3d

540, 553 (6th Cir.2001), *cert. denied,* 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002)). However, plaintiffs must plead with particularity only sufficient facts to support their beliefs, and not every fact necessary to prove their claim. *Novak v. Kasaks,* 216 F.3d 300, 313–14 (2d Cir.), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

*Bond Opportunity Fund v. Unilab Corp.,* No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003).

## IV. *Discussion*

### A. *Agency*

 Many of the Plaintiffs' allegations against the Defendants necessarily proceed on the assumption that Assemi, who is not alleged to have been an ABW employee, was acting as an agent for the ABW Defendants in the course of the alleged fraud. The federal common law and state law cases are consistent insofar as the applicable principles of agency are concerned. *See 36 Convent Ave. HDFC v. Fishman,* No. 03 Civ. 3998(JGK), 2004 WL 1048213, at *3 (S.D.N.Y. May 7, 2004). In general, an agent has the power "to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Minskoff v. Am. Express Travel Related Servs. Co.,* 98 F.3d 703, 708 (2d Cir.1996) (quoting *Restatement (Second) of Agency* § 7 cmt. a (1958)). Such authority to act for a principal may be either actual or apparent. *See C.E. Towers Co. v. Trinidad & Tobago Airways, Corp.,* 903 F.Supp. 515, 523 (S.D.N.Y.1995); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l,* 758 F.Supp. 908, 919–21 (S.D.N.Y. 1991).

 "Actual authority arises from a manifestation of consent from principal to agent." *Id.* at 919. The doctrine of apparent authority, however, requires a "factual showing that [a] third party relied upon the misrepresentations of the agent because of some misleading conduct *on the part of the principal*—not the agent." *Herbert Constr. Co. v. Cont'l Ins. Co.,* 931 F.2d 989, 993 (2d Cir.1991) (emphasis added); *see also Reiss v. Societe Centrale du Groupe des Assurances Nationales,* 246 F.Supp.2d 273, 283 (S.D.N.Y.2003) (quoting *Herbert*). "Apparent authority, then, is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent." *Minskoff,* 98 F.3d at 708; *see also 36 Convent Ave.,* 2004 WL 1048213, at *3 ("The scope of apparent authority is defined by the principal's manifest acts; an agent cannot create apparent authority in himself.").

 Even in the absence of actual or apparent authority, a person may still be liable as a principal if he affirms or ratifies "an act done by one who purports to be acting for the ratifier." *Carte Blanche,* 758 F.Supp. at 921. Under New York law, it is possible to imply ratification if the principal "retains the benefit of an unauthorized transaction with knowledge of the material facts." *Standard Funding Corp. v. Lewitt,* 89 N.Y.2d 546, 552, 656 N.Y.S.2d 188, 678 N.E.2d 874 (1997). Thus, ratification is a "form of retroactive activity" that occurs when the principal, having knowledge of the material facts, "accepts the benefits of [the] agent's action" already made on his behalf. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1213 (S.D.N.Y.1994); *accord Reiss,* 246 F.Supp.2d at 283 (quoting *Banque Arabe*).

In one of his decisions arising out of the demise of the Parmalat companies, Judge Kaplan considered whether an allegation

of agency in a securities fraud complaint must be pleaded with particularity. *See In re Parmalat Secs. Litig.*, 375 F.Supp.2d 278, 290–92 (S.D.N.Y.2005). In that case, the purported plaintiff class alleged that several accounting firms' Italian affiliates had actively participated in a fraud which was tantamount to a "Ponzi" scheme. *Id.* at 283–84, 289. Arguing that the firms were, in reality, integrated organizations, the plaintiffs sought to hold certain related entities, including the United States affiliates, liable on an agency theory. Finding that the existence or nonexistence of an agency arrangement was not a factor on which the plaintiffs relied in the course of making their investments, but, rather, simply a basis on which they sought to impose vicarious liability, Judge Kaplan held that "[t]his allegation is not so closely intertwined with the claim of securities fraud that it is a circumstance of the fraud itself." *Id.* at 291. For this reason, Judge Kaplan held that the sufficiency of the plaintiffs' agency allegations was not to be judged under Rule 9(b). Instead, to survive the defendant's motion to dismiss, the plaintiffs only had to meet the requirement of Rule 8(a) of the Federal Rules of Civil Procedure by setting forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (holding, in the context of an employment discrimination case, that a plaintiff need not plead a prima facie case to meet the requirements of Rule 8(a) and to survive a motion to dismiss).

In *Parmalat*, Judge Kaplan distinguished *Kolbeck v. LIT Am., Inc.*, 923 F.Supp. 557 (S.D.N.Y.1996), a case which is not unlike the present one. There, an unregistered salesman induced customers to invest in commodity futures by emphasizing his close ties to the futures commis-

sion merchant ("FCM") through which he executed their trades. *Id.* at 561. Indeed, the plaintiffs alleged that he led prospective customers on tours of the FCM's offices and the Exchange trading floor, during which he made frequent misrepresentations in the presence of an employee of the FCM who was registered with the Commodities Futures Trading Commission as an associated person. *Id.* at 561–62. Although the complaint did not detail precisely what was said, or by whom, it alleged that the FCM's employee "did nothing to correct these obvious lies, misstatements and half-truths." *Id.* at 562. Similar allegations were made concerning the salesman's dealings with a second commodities firm. *Id.* On these facts, Judge Mukasey concluded that, to the extent the plaintiffs alleged a conspiracy between the salesman and the other defendants to defraud the plaintiffs, and, as part of this conspiracy, those defendants made the salesman their agent under the doctrines of "apparent authority, ratification or agency by estoppel," their allegations had to comply with the requirements of Rule 9(b). *Id.* at 569. The court further held that "[w]hen an implied agency relationship is allegedly part of the fraud, the circumstances constituting the fraud on the part of the purported principal include both the facts constituting the underlying fraud and the facts establishing the agency relationship." *Id.* (internal quotations omitted).

■ In this case, the Plaintiffs plainly seek to hold at least some of the ABW Defendants liable not merely vicariously, but because their relationship with Assemi was an integral part of the fraud. For example, the Plaintiffs allege that *all* of the defendants conspired to lure them to deposit funds into a non-existent Non–Depletion account. (Am.Compl.¶ 109). Since there has been no showing that Assemi

was an ABW employee or that the ABW Defendants made any false statements to the Plaintiffs at or prior to the time of the Dover investment, the ABW Defendants could only be held liable for the alleged fraud if Assemi was working as their agent to fraudulently induce Yap to remit the Dover funds. Thus, the theory of recovery against the ABW Defendants plainly is not merely vicarious liability. For this reason, the Plaintiffs' allegation of agency must meet the stringent requirements of Rule 9(b).

The Amended Complaint alleges that ABW is responsible for Assemi's misconduct based on three different agency theories: agency in fact, apparent authority and ratification. (*See id.* ¶¶ 12, 23, 41; Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Mem.") at 10–13). The Plaintiffs' allegations, however, are inadequate to support this assertion.

 In support of the "agency in fact" theory, the Plaintiffs note that Assemi approached Yap to invest with ABW and told her that he would share his profits with that firm. The Plaintiffs also note that Yap sent the signed Account Opening Agreement to Coakley at ABW, rather than Assemi. (Pls.' Mem. at 10). While there is no doubt that Assemi fraudulently misrepresented the nature of the investment he was offering during his discussions with Yap, the only suggestion of agency in the Amended Complaint is an allegation made *"upon information and belief"* that his sales pitch was made "on behalf of ABW." (Am.Compl.¶ 26) (emphasis added). In this Circuit, there is a limited exception to the Rule 9(b) requirement that fraud be pleaded with particularity which is applicable when the subject matter is peculiarly within a defendant's knowledge. *See Ayyash v. Bank Al–Madina,* No. 04 Civ. 9201(GEL), 2006 WL 587342, at *5 n. 6 (S.D.N.Y. Mar.9, 2006)

(citing *Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997)). Even in that circumstance, however, "the allegations must be accompanied by a statement of facts upon which the belief is founded." *Henneberry v. Sumitomo Corp. of Am.,* No. 04 Civ. 2128(PKL), 2006 WL 416395, at *21 (S.D.N.Y. Feb.21, 2006) (quoting *Pits,* 911 F.Supp. at 716). Here, the only facts that the Plaintiffs have been able to muster in the Amended Complaint to establish actual agency are that the Account opening paperwork was sent directly to Coakley at ABW and that Assemi said he would be paid 50 percent of the profits on the Dover investment directly by ABW. (Am. Compl.¶¶ 25–26). Neither of these alleged facts supports the inference that *ABW* had authorized Assemi to represent that the funds in the Account would be fully protected and yet be able to return a 50 percent profit in only four months. The Plaintiffs' allegations with respect to actual authority consequently are legally insufficient.

 Turning to the issue of apparent authority, the Plaintiffs allege in their opposition papers that Sorrentino and Coakley finalized the paperwork relating to the Account and that Malin worked with Assemi on the Account "knowing of defendant Assemi's claims." (Pls.' Mem. at 11). Only the first of these allegations is actually set forth in the Amended Complaint. In any event, the sine qua non of an apparent authority claim is that the principals have communicated to a third party (here, the Plaintiffs) through its words or conduct that the agent had authority to act. *See e.g., Standard Funding,* 89 N.Y.2d at 551, 656 N.Y.S.2d 188, 678 N.E.2d 874. If that is shown, the third party's reasonable reliance upon the apparent agent's authority binds the principal. *Id.* The Account paperwork in this

case, which is the sole basis of the Plaintiffs' apparent authority claim, neither suggests that Assemi had the right to solicit a Non–Depletion Account on ABW's behalf, nor provides a basis for the Plaintiffs to assume that he could. Indeed, the paperwork makes no mention of any loss-protected account. It also refers to Assemi and Elfort solely in the "Special Reference Section" of the Account application, which lists such other possible reference sources as "Internet chat" and the "Wall Street Journal." (Am. Compl. Ex. B at 4). Viewed in this context, the mere insertion of Assemi's typewritten name in this section cannot reasonably be viewed as ABW's implied concession that he was its agent.

■ On the other hand, the Amended Complaint alleges that after the initial losses in the Account, Yap requested that ABW return $6.75 million of the original $10 million Dover investment in the Account. (*Id.* ¶ 46). Although the Account evidently had sustained nearly $3 million in losses by then, the Plaintiffs allege that, during a July 16, 2003 conference call, Malin and Assemi told Yap "that ABW would be working with Dover's remaining $3,250,000 balance ... to make Dover 'lots of money.'" (*Id.*). In their view, since the Account would not have contained this sum after the requested transfer was made, Malin's promise is an implied admission that the Account should have had a $10 million balance as of that date, thereby confirming, after the fact, that the Account should have been loss-protected. Moreover, Malin, acting on behalf of ABW, is alleged to have accepted a benefit of the Account being loss-protected—the ability to continue to trade some of Dover's funds—rather than suggesting that the Account never had a loss-protection feature.

Rule 9(b) imposes upon the Plaintiffs the duty to plead their allegations of fraud with particularity. Here, they evidently have quoted Malin and Assemi as providing assurances that ABW would make "lots of money" for Dover, but have not stated specifically what Malin or Assemi said during their phone conversation with Yap with respect to the size of the balance that was available to trade. If they represented that ABW would be trading an account which had a balance of $3.25 million even after transferring out $6.75 million, Malin's participation in the conversation may have impliedly ratified Assemi's authority to act as ABW's agent to offer a Non–Depletion Account. On the other hand, if they merely offered to trade the then-existing balance, regardless of its size, no such inference would be warranted. Since it is unclear from the Amended Complaint which of these scenarios, if any, corresponds to the facts, the Plaintiffs have not pleaded with sufficient particularity their allegation that Malin (and therefore ABW) ratified Assemi's prior fraudulent representations to Yap.

### B. *Exchange Act*

#### 1. *Section 10(b) and Rule 10b–5*

Count I of the Amended Complaint alleges that all of the defendants violated Section 10(b) of the Exchange Act, and Rule 10b–5 thereunder, by engaging in a course of conduct, and making a series of false and misleading statements of material fact, to induce Dover to place its funds with ABW for the purpose of investing in a purported Non–Depletion Account which, in fact, was not offered by ABW, thereby resulting in the loss of the Plaintiffs' investment. (Am.Compl.¶¶ 70–86).

Section 10(b) is a "catchall provision" which entitles a plaintiff to recover damages for manipulative practices undertaken by defendants acting in bad faith. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185,

205–06, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The statute provides, in relevant part, that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, the parallel regulation, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact . . . necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■■■■ To state a claim for relief under Section 10(b) and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 161 (2d Cir.2000); *accord Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). A plaintiff alleging that a defendant engaged in securities fraud in violation of these provisions must satisfy the pleading requirements of both Rule 9(b) and PSLRA. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir.2001).

#### a. *Statements and omissions*

■■■■ At the pleading stage, a plaintiff satisfies the materiality requirement of Section 10(b) and Rule 10b–5 by "alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 161. For each such statement or omission, a court must determine whether the "defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA. com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002) (citing *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (the materiality requirement for Section 10(b) and Rule 10b–5 violations is met when there is a "substantial likelihood" that the statement or the disclosure of an omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

While "[i]t is not sufficient to allege that the investor might have considered the misrepresentation or omission important" when considering statements or omissions, "it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Ganino,* 228 F.3d at 162. Materiality is a mixed question of law and fact. *Id.* A complaint fails to state a claim only if *"no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin,* 295 F.3d at 359 (emphasis in original); *see also Ganino,* 228 F.3d at 162 ("a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance") (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)).

Turning first to Assemi, the Amended Complaint plainly adequately alleges false and misleading statements on his part. Thus, the Plaintiffs allege that four days before the opening of the Account, Assemi told Yap about a Non–Depletion Account offered by ABW, by means of which an investment of $10 million would result in a risk-free 50% profit in four months. (*See* Am. Compl. ¶ 24). As subsequent events demonstrate, these representations were both material and untrue. These also were not Assemi's only false or misleading statements. When Yap questioned the initial Account losses, Assemi allegedly told her it was due to a "computer error." (*Id.* ¶ 41). Additionally, when it became clear that no payout was forthcoming, Assemi continued to assure Yap through September 2003 that Dover would soon receive its previously-anticipated return. (*Id.* ¶ 48 & Ex. E).

The Plaintiffs contend that the Amended Complaint also sufficiently alleges material misrepresentations and omissions on the part of Coakley because he allegedly told them that ABW's "legal department" required them to change their investment objective on the account opening forms from "Growth" to "Aggressive Growth/Speculation," whereas, in reality, ABW had no legal department and there was no such requirement. (*See* Pls.' Mem. at 21; *see also* Am. Compl. ¶¶ 28–33). To the extent that Coakley insisted on changing the Account objective to include speculation, there plainly was no misstatement since he was, in effect, warning Yap that her investment on behalf of Dover was not risk-free. Indeed, the description of "Aggressive Growth Speculation" on the Account paperwork clearly stated that it was "the most risky form of investing" available to ABW customers. (*See* Am. Compl. Ex. B at 3). The other alleged misrepresentation, that ABW had a legal department, seems to be of questionable materiality, but I will assume, for present purposes, that it was in fact material.

The Amended Complaint also alleges that on June 6, 2003, Amore was named the Plaintiffs' "Authorized Agent" pursuant to a Limited Trading Authorization. (*Id.* ¶ 32). Amore is mentioned in only two other portions of the Amended Complaint. First, the Plaintiffs allege that Assemi informed Yap that Amore was fired by ABW due to his "reckless trading" of accounts, including the Dover Account. Second, the Plaintiffs allege that Assemi and Malin told Yap that they suspected Amore of stealing Dover's $3 million, that he was under investigation by the FBI and NASD, and that ABW was suing him for "restitution of the funds." (*Id.* ¶¶ 54–55). Conspicuously absent from the Amended Complaint is any allegation that Amore

ever made any material misrepresentations to the Plaintiffs or that they ever spoke to him. Accordingly, because there has been no suggestion that Amore had a duty to contact the Plaintiffs, his failure to warn them that there was no such thing as a risk-free, high-yield account plainly does not constitute an omission entitling them to proceed against him on a securities fraud claim.

Finally, there is no suggestion in the Amended Complaint that any of the other ABW Defendants made any statement to Dover or Yap in connection with the purchase or sale of securities. Nor has there been a showing that these defendants were aware that Assemi had promised that the Account would be risk-free and yield an enormous return and, therefore, had a duty to correct a misimpression of which they were aware.[5]

In sum, the Plaintiffs have, at best, adequately pleaded material misrepresentations and omissions on the part of Assemi and Coakley.

#### b. *Scienter*

To prevail in an action brought under Section 10(b) or Rule 10b–5, a plaintiff also must allege that the defendants acted with "an intent to deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168 (quoting *Hochfelder*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375). Under the PSLRA, with respect to each act or omission alleged to have violated the Exchange Act, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). In this Circuit, this requirement is satisfied by alleging either (a) "facts to show that defendants had both motive and

opportunity to commit fraud," or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito*, 47 F.3d at 52; *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001); *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir.2000) (indicating that the PSLRA "did not change the basic pleading standard for scienter in this [C]ircuit").

##### i. *Motive and Opportunity*

To establish motive, a plaintiff must allege "concrete benefits that could be realized by one or more false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). To establish opportunity, the plaintiff must allege that the defendants had the "means and likely prospect of achieving concrete benefits by the means alleged." *Id.* Motives that are "generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139.

Here, the Plaintiffs have properly pleaded both motive and opportunity with respect to Assemi. Indeed, his own statements to Yap show that he expected to receive half of all profits earned in the Account and that ABW would pay him directly. (Am.Compl.¶¶ 25, 51, 54). There has been no showing, however, that Coakley similarly stood to gain individually from the actions and statements attributed to him. Accordingly, the Plaintiffs have not shown that Coakley had a motive to misrepresent the facts.

---

5. In fact, as the Plaintiffs admit in the Amended Complaint, when Yap asked ABW's counsel, Ference, about the status of the Account and why it had lost money, Ference indicated

that he was at a "complete loss" as to what Yap was talking about because ABW did not offer such a Non–Depletion investment program. (*Id.* ¶ 51).

### ii. Conscious Misbehavior or Recklessness

■ A plaintiff may also satisfy the pleading standard by alleging facts showing conduct on the part of the defendant which was "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (quoting *Honeyman v. Hoyt (In re Carter–Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir.2000)). This requirement is satisfied when a plaintiff has "specifically alleged [a defendant's] knowledge of facts or access to information contradicting [his] public statements" and that the defendant "knew, or more importantly, should have known that [he was] misrepresenting material facts." *Id.* (quoting *Novak*, 216 F.3d at 308).

■ The outrageous promises attributed to Assemi in the Amended Complaint obviously meet this standard. Coakley's alleged statement concerning the existence of a legal department, on the other hand, is mere puffery and does not adequately establish that he acted with scienter.

Accordingly, the Plaintiffs have adequately alleged scienter on the part of Assemi but not on the part of Amore or any of the ABW Defendants.

### c. Causation

■ It is well-settled in this Circuit that causation under federal securities laws is "two-pronged." *Suez Equity*, 250 F.3d at 95–96. In order to satisfy both prongs, "a plaintiff must allege both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (italics in original). A similar standard applies under the PSLRA because the statute requires a showing that the act complained of "caused the loss for which the plaintiff seeks to recover damages." *Id.* (quoting 15 U.S.C. § 78u–4(b)(4)).

■ It is a fair inference from the Amended Complaint that the Plaintiffs would not have opened the Account had it not been for Assemi's misrepresentations. As a technical matter, however, while they allege that they relied on Assemi's statements, they do not say that they would not have invested but for those statements. This, of course, is a minor glitch which the Plaintiffs can easily correct. Accordingly, for present purposes, I will deem the Amended Complaint to have been so amended. *See, e.g., Diversified Carting, Inc. v. City of New York*, No. 04 Civ. 9507(HB), 2005 WL 1950135, at *1 n. 1 (S.D.N.Y. Aug.15, 2005) (deeming plaintiff's complaint amended to substitute new defendant); *Drake v. Lab. Corp. of Am. Holdings*, 323 F.Supp.2d 449, 452 (E.D.N.Y.2004) (deeming complaint amended to allege diversity jurisdiction); *State of New York v. Shore Realty Corp.*, 648 F.Supp. 255, 262 (E.D.N.Y.1986) (granting plaintiff's request to deem pleadings amended to incorporate certain allegations "[t]o save time and a needless waste of resources").

■ The Plaintiffs' allegations with respect to the loss causation element of its securities law claim against Assemi are plainly sufficient. In their Amended Complaint, the Plaintiffs allege that within a matter of weeks after the Account was opened, Dover had already lost $2,667,739.00. (*See* Am. Compl. ¶ 39). After repeated assurances by Assemi that this was due to a "computer error" which he would have remedied, the Plaintiffs did

not withdraw Dover's funds. (*Id.* ¶ 41). Thereafter, by July 13, 2003, the date of the next statement, the Account had "declined in value from $10,000,000 to $7,005,173.90," a difference of nearly $3 million. (*Id.* ¶ 42). In their first claim for relief, the Plaintiffs seek to recover an amount not less than $2,994,597.84. It is clear that but for Assemi's misrepresentations and omissions, this amount would not have been lost.

In sum, the Plaintiffs have adequately pleaded their Section 10(b) claim, but only as against Assemi. Accordingly, the remaining Defendants' motions to dismiss this claim must be granted.

### 2. *Section 20(a)*

█ In their second claim for relief, the Plaintiffs allege that each of the Individual Defendants is liable for the Section 10(b) violations alleged in the Amended Complaint pursuant to Section 20(a) of the Exchange Act, as a "control person." (*See* Am. Compl. ¶¶ 6, 11, 72, 87–91). Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Controlling person liability under Section 20(a) is "a form of secondary liability, under which a plaintiff may allege a primary [Section] 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." *Suez Equity*, 250 F.3d at 101 (citing *SEC*

*v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)).

█ To state a claim under Section 20(a), a plaintiff must allege at least two elements: (1) "a primary violation by [a] controlled person" and (2) direct or indirect "control of the primary violator by the defendant." *First Jersey*, 101 F.3d at 1472. Control may be established by showing that the defendant possessed, either directly or indirectly, "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2; *see In re WorldCom, Inc. Secs. Litig.*, 294 F.Supp.2d 392, 414–415 (S.D.N.Y.2003) (noting that the court in *First Jersey* adopted the definition of control in 17 C.F.R. § 12b–2 as the standard for a Section 20(a) claim).

█ The Plaintiffs' Amended Complaint alleges that the Individual Defendants, with the exception of Assemi, are liable as control persons for the securities fraud perpetrated by ABW. Because the first claim for relief has been dismissed against ABW, the Plaintiffs cannot fulfill the first element required to establish a Section 20(a) claim. Therefore, even if the Individual Defendants are ABW control persons, the Plaintiffs' second claim for relief against them under Section 20(a) must be dismissed.

### C. *Common Law Claims*

The Amended Complaint also contains several common law claims, including breach of contract. The ABW Account opening customer paperwork contains a provision which states that "this Agreement and its enforcement shall be governed by the laws of the state of Texas." (Am. Compl. Ex. B at 5). Despite this provision, neither the Plaintiffs nor the Defendants have cited any Texas law or

suggested that it applies. In fact, all of the state law that they cite relates to the State of New York. Additionally, the Amended Complaint states that the Plaintiffs' claims arise "under the laws of the United States and the State of New York." (*Id.* ¶ 1). For these reasons, I have applied New York law to determine the adequacy of the Plaintiffs' state law claims.

### 1. *Fraud*

The Plaintiffs' third claim for relief alleges that the Individual Defendants perpetrated a fraud by representing that they would invest Dover's money in a Non–Depletion Account with highly favorable rates of return, when they knew no such account existed, thereby causing extensive monetary damages. (*See id.* ¶¶ 92–107).

■■■■ To state a claim for common law fraud in New York, a plaintiff must show: (1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff. *See HealthExtras, Inc. v. SG Cowen Secs. Corp.,* No. 02 Civ. 9613(RO), 2004 WL 97699, at *1 (S.D.N.Y. Jan.20, 2004); *Morris v. Castle Rock Entm't,* 246 F.Supp.2d 290, 296 (S.D.N.Y.2003); *Farey–Jones v. Buckingham,* 132 F.Supp.2d 92, 105 (E.D.N.Y. 2001). A claim for common law fraud brought under New York law must also satisfy the particularity requirements of Rule 9(b). *See Marcus,* 329 F.Supp.2d at 475; *AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC,* 254 F.Supp.2d 373, 389 (S.D.N.Y.2003); *Lewis v. Rosenfeld,* 138 F.Supp.2d 466, 477–78 (S.D.N.Y. 2001). "The elements of common law fraud are, therefore, essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b–5." *Pits,* 911 F.Supp. at 719.

■■■■ Accordingly, in light of the discussion of their securities fraud claims, the Plaintiffs' common law fraud claim must also be dismissed as against the ABW Defendants, but will be permitted to proceed against Assemi.

### 2. *Conspiracy to Commit Fraud*

■■■ In their fourth claim for relief, the Plaintiffs allege that all of the defendants conspired to lure them to deposit funds into a Non–Depletion Account, an investment vehicle which they knew did not exist, thereby causing Dover significant damage. (*See* Am. Compl. ¶¶ 108–17). It is a well-settled principle of New York law that there is no independent cause of action for conspiracy to commit fraud. *Aetna Cas. and Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 591 (2d Cir.2005); *Farey–Jones,* 132 F.Supp.2d at 105; *see also Morris,* 246 F.Supp.2d at 296 (an independent claim of conspiracy to commit fraud must be dismissed when the underlying fraud claim is dismissed); *Agostini v. Sobol,* 304 A.D.2d 395, 395, 757 N.Y.S.2d 555 (1st Dep't 2003) ("A mere conspiracy to commit a fraud is never of itself a cause of action.") (internal citation and quotations omitted). "However, a claim of conspiracy may lie where an underlying tort of fraud has been adequately pleaded." *Farey–Jones,* 132 F.Supp.2d at 104.

■■■ Obviously, Assemi could not have conspired only with himself. *See Societe Generale v. Fed. Ins. Co.,* 856 F.2d 461, 465 (2d Cir.1988). Consequently, because the Plaintiffs have not successfully alleged that anyone else knowingly participated in the fraud, there is, as a matter of law, no basis for their conspiracy claim. Accordingly, the Plaintiffs' fourth claim for relief must be dismissed.

### 3. Conversion

In their fifth claim for relief, which is captioned "Conversion," the Plaintiffs allege that all of the Defendants intentionally misused and concealed the misuse of Dover's funds. (*See* Am. Compl. ¶¶ 118–28).

■■■■■ "Conversion is the unauthorized and wrongful exercise of dominion and control over another's personal property." *Phansalkar v. Andersen Weinroth & Co., L.P.,* 175 F.Supp.2d 635, 639 (S.D.N.Y.2001) (internal citation and quotations omitted). The general rule in New York is that "a claim for conversion does not lie for the withholding of indefinite, intangible, and incorporeal species of property." *Id.* (quoting *Matzan v. Eastman Kodak Co.,* 134 A.D.2d 863, 521 N.Y.S.2d 917 (4th Dep't 1987)). A conversion action for money, however, will lie under New York law where there is a specific, identifiable fund and "an obligation to return or otherwise treat in a particular manner the specific money in question." *LoPresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir.1997) (internal citation and quotations omitted).

■■■ Additionally, "to sustain a conversion claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights." *Global View Ltd. Venture Capital v. Great Central Basin Exploration, LLC,* 288 F.Supp.2d 473, 479–80 (S.D.N.Y.2003) (quoting *Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984)).

■■■ In this case, the Plaintiffs' breach of contract claim alleges that Dover's funds were invested improperly, resulting in losses, rather than being kept inviolate while simultaneously generating enormous profits, as they had been promised. In their conversion claim, however, the Plaintiffs allege that ABW improperly applied Dover's money to satisfy someone else's indebtedness resulting from a trade that had occurred before the Dover Account was opened. In layman's terms, the Plaintiffs allege that the Defendants stole some of Dover's funds. At least at this preliminary stage, this claim seems to differ from the Plaintiffs' contractual claim. Moreover, the Dover Account would appear to be a specific identifiable fund.

The Plaintiffs' allegations nevertheless do not permit their conversion claim to proceed against all the Defendants. Indeed, there is nothing in the Amended Complaint to suggest that any of the Defendants other than ABW itself was responsible for the improper transfer of Dover's funds to another account. For this reason, the conversion claim may proceed only against ABW.[6]

### 4. Breach of the Customer Agreement

The sixth claim for relief, in which only ABW is named as a defendant, alleges that ABW breached an agreement pursuant to which the Plaintiffs would invest $10 million into the Account, in exchange for ABW's assurances of "complete security against any loss to Plaintiffs' investment and a return of no less than $5 million . . . by September 15, 2003." (Am. Compl.¶ 130). The Plaintiffs further allege that ABW breached the material terms of this agreement by failing to provide the promised security and by failing to pay to the Plaintiffs any return. (*Id.* ¶¶ 132–33).

---

**6.** In the Amended Complaint, the Plaintiffs allege that Malin told Yap during the June 1 meeting that Dover's $3 million "may have been stolen by Mr. Amore." (Am. Compl.¶ 54). The Plaintiffs nevertheless concede elsewhere in the Amended Complaint, "[u]pon information and belief, [that] ABW, not Mr. Amore, misallocated or converted" Dover's funds. (*Id.* ¶ 62).

■ To state a claim for breach of contract under New York law, a complaint must allege: (1) the existence of an agreement; (2) the plaintiff's adequate performance of that agreement; (3) a breach by the defendant; and (4) damages. *Log On Am., Inc. v. Promethean Asset Mgmt. LLC,* 223 F.Supp.2d 435, 451 (S.D.N.Y. 2001) (citing *Harsco Corp. v. Segui,* 91 F.3d 337 (2d Cir.1996)); *Johnson v. City of New York,* No. 99 Civ. 0165(DAB), 2000 WL 377514, at *5 (S.D.N.Y. Apr.12, 2000).

■ In an effort to demonstrate that their Amended Complaint meets these requirements, the Plaintiffs suggest that they have adequately alleged a "breach of the agreement made by ABW's agent defendant Assemi to invest Plaintiffs' money in an ABW Non–Depletion Account." (Pls.' Mem. at 30). As noted earlier, however, the Plaintiffs have not pleaded facts sufficient to suggest that Assemi was working as ABW's agent when it solicited the Account. Furthermore, there is nothing in the customer paperwork or Coakley's and Sorrentino's limited dealings with Yap which would suggest that ABW itself had agreed to provide the Plaintiffs with a loss-protected, yet extraordinarily high yielding, account.

For these reasons, the Plaintiffs have not adequately pleaded a breach of contract claim against ABW. Moreover, the Plaintiffs have not established that ABW breached any of the terms of its written contract with the Plaintiffs. The sixth claim for relief therefore must be dismissed.

### 5. *Breach of Implied Covenant of Good Faith and Fair Dealing*

The Plaintiffs's seventh claim is that ABW breached the implied covenant of good faith and fair dealing by failing to invest Plaintiffs' $10 million in a Non–Depletion Account. (*See* Am. Compl. ¶¶ 129–34).

■ To establish a breach of the covenant of good faith and fair dealing, Plaintiffs must show: "( [a] ) fraud, ( [b] ) malice, ( [c] ) bad faith, ( [d] ) other intentional wrongdoing, or ( [e] ) reckless indifference to the rights of others." *Log On Am.,* 223 F.Supp.2d at 451 (citing *T.P.K. Constr. Corp. v. S. Am. Ins. Co.,* 752 F.Supp. 105, 112 (S.D.N.Y.1990)). Nonetheless, even when a showing is made, claims alleging a breach of the covenant typically are treated as a "breach of the underlying contract." *Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas. Inc.,* No. 02 Civ. 7666(LBS), 2004 WL 1886293, at *8 (S.D.N.Y. Aug.24, 2004). Thus, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243–44 (S.D.N.Y.1997). Such a claim may be brought "only if it is based on allegations different than those underlying the accompanying breach of contract claim." *Siradas v. Chase Lincoln First Bank, N.A.,* No. 98 Civ. 4028(RCC), 1999 WL 787658, at *6 (S.D.N.Y. Sept.30, 1999).

■ Here, Plaintiffs' implied covenant claim must be dismissed for at least three reasons. First, as noted above, the Plaintiffs have failed to plead adequately the existence of an implied covenant with ABW concerning a Non–Depletion Account because their implied covenant claim duplicates their breach of contract claim against ABW. *See id.* Second, the Plaintiffs have not alleged that ABW breached the terms of its written agreement with them. Third, even if Assemi made promises as ABW's agent with respect to a Non–Depletion Account, the Defendants would be en-

titled to dismissal of this claim because it is duplicative of the Plaintiffs' breach of contract claim against ABW.

### 6. Negligent Misrepresentation

The Plaintiffs' eighth and final claim against all defendants alleges negligent misrepresentation. (See Am. Compl. ¶¶ 139–45). Specifically, the Plaintiffs contend that they "properly relied upon Defendants' material misrepresentations that in return for placing $10,000,000.00 with ABW, Defendants would invest the funds in a Non–Depletion Account and the Account would realize a profit of $5 million ... by September 15, 2003." The Plaintiffs further allege that the Defendants did not offer such an account and that, contrary to the Defendants' representations, the Account, in fact, lost money. (Id. ¶ 140–41).

Under New York law, the elements of a negligent misrepresentation claim are: "([a]) carelessness in imparting words, ([b]) upon which others were expected to rely, ([c]) upon which they did act or failed to act, ([d]) to their damage, and ([e]) the author must express the words directly, with knowledge they will be acted upon, to one whom the author is bound by some relation or duty of care." Patell Indus. Mach. Co., Inc. v. Toyoda Mach. U.S.A., Inc., 880 F.Supp. 96, 99 (N.D.N.Y.1995) (quoting In re Drexel Burnham Lambert Group, Inc., 151 B.R. 49, 60 (S.D.N.Y.1993)). Most judges in this District, however, have concluded that a claim of negligent misrepresentation which arises out of the sale of securities is barred by New York's Martin Act. See N.Y. Gen. Bus. Law § 352, et seq. (McKinney 1996); Marcus, 329 F.Supp.2d

at 475–76; Nanopierce Tech., Inc. v. Southridge Capital Mgmt., LLC, No. 02 Civ. 0767(LBS), 2003 WL 22052894, at *2–*3 (S.D.N.Y. Sept.2, 2003); Mfr. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Secs. Corp., No. 99 Civ.1944(NRB), 2000 WL 709006, at *5 (S.D.N.Y. June 1, 2000); Noz v. Value Investing Partners, Inc., No. 98 Civ. 6977(RO), 1999 WL 387400, at *2 (S.D.N.Y. June 14, 1999). "Thus, courts have dismissed state law claims covered by the Martin Act on the grounds that permitting them to proceed would be equivalent to permitting a private claim under the Act." Spirit Partners, L.P. v. audiohighway.com, No. 99 Civ. 9020(RJW), 2000 WL 685022, at *6 (S.D.N.Y. May 25, 2000) (internal citation and quotations omitted).

In an effort to avoid this result, the Plaintiffs cite Scalp & Blade, Inc. v. Advest, 281 A.D.2d 882, 883, 722 N.Y.S.2d 639 (4th Dep't 2001), a case which held that negligent misrepresentation claims are not precluded by the Martin Act. (See Pls.' Mem. at 31). The Fourth Department's entire discussion of this issue consists of a single sentence set forth in the margin.[7] More recently, in Nanopierce, Judge Sand noted that Scalp & Blade and another case, Cromer Fin. Ltd. v. Berger, Nos. 00 Civ. 2284, 00 Civ. 2498(DLC), 2001 U.S. Dist. LEXIS 14744, at *11–*15 (S.D.N.Y. Sept. 20, 2001) "stand as solitary islands in a stream of contrary opinion." Nanopierce, 2003 WL 22052894, at *4. After a thorough analysis of both cases, Judge Sand concluded that common law claims which "essentially mimic the Martin Act" are precluded. Id. In arriving at this determination, Judge Sand relied on the Second Circuit's decision in Castellano v.

---

7. "Nothing in the Martin Act, or in the Court of Appeals cases construing it, precludes a plaintiff from maintaining common-law causes of action based on such facts as might give the Attorney General a basis for proceeding civilly or criminally against a defendant under the Martin Act." Id.

*Young & Rubicam, Inc.,* 257 F.3d 171, 190–91 (2d Cir.2001), which held that a state law claim for breach of fiduciary duty was precluded by the Martin Act. For the reasons detailed in *Nanopierce,* I conclude that the Plaintiffs' negligent misrepresentation claim constitutes an implied private right of action under the Martin Act which cannot be brought before this Court.

As in *Nanopierce,* the Plaintiffs' fallback position is that New York law should not apply because they are Indonesian and Assemi is based in California. What the Plaintiffs overlook, however, is that the Amended Complaint specifically states that it arises under New York law. (Am. Compl.¶ 1). Moreover, this Court's authority to hear the common law claims arises, at least in part, from its diversity jurisdiction. (*Id.* ¶ 15). When a federal court decides a state law claim under its diversity jurisdiction, the substantive law of the forum state applies. *See Erie v. Tompkins,* 304 U.S. 64, 78–79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Here, it is undisputed that ABW is located in New York, the Account was opened by ABW in New York, and much of the conduct that the Plaintiffs complain about occurred in New York. Accordingly, New York has the most substantial interest in regulating ABW's conduct, and its laws should govern this action. *See Atlantic Richfield Co. v. Arco–Globus Int'l Co.,* No. 95 Civ. 6361(JFK), 1996 WL 742863, at *3 (S.D.N.Y.1996). The Plaintiffs' negligent misrepresentation claim consequently is preempted by the Martin Act.

## V. *Conclusion*

For the reasons set forth above, the ABW Defendants' motion to dismiss (Docket No. 39) and Assemi's motion to dismiss (Docket No. 47) are granted in part and denied in part. Amore's motion to dismiss (Docket Nos. 41, 44) is granted in its entirety. Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, the Plaintiffs are granted thirty days to replead to the extent the defects identified herein can be corrected through repleading.